## CASE NO. 24-3789

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MARLI BROWN AND LACEY SMITH,

*Plaintiffs-Appellants*,

v.

ALASKA AIRLINES, INC. AND
ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington at Seattle
Case No. 2:22-cv-668-BJR

## APPELLANTS' BRIEF

Jeffrey C. Mateer
David J. Hacker
Stephanie N. Taub
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444

Rebecca R. Dummermuth
Tabitha M. Harrington
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. N.W., Suite 1410
Washington, D.C. 20004
(202) 921-4105

Andrew W. Gould
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 E. Camelback Rd., Suite 860
Phoenix, AZ 85016
(540) 341-8808

Attorneys for Appellants
Marli Brown and Lacey Smith

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument. Argument may benefit the Court because this case involves an extensive record and important legal issues related to religious employment discrimination claims brought against employers and unions.

## TABLE OF CONTENTS

Statement Regarding Oral Argument ........................................................................ ii

Table of Contents ...................................................................................................... iii

Table of Authorities.................................................................................................... v

Introduction ................................................................................................................1

Jurisdictional Statement ............................................................................................2

Issues Presented..........................................................................................................2

Relevant Statutory Provisions ...................................................................................3

Statement of the Case .................................................................................................3

    I.    Background ................................................................................................3

    II.  Procedural History ...................................................................................9

Summary of Argument...............................................................................................10

Standard of Review ....................................................................................................10

Argument.....................................................................................................................11

    I.    Plaintiffs presented sufficient evidence that Alaska Airlines discriminated against Plaintiffs because of their religious beliefs.............................................11

    II.  Plaintiffs presented sufficient evidence that the Union discriminated against Plaintiffs because of their religious beliefs..........................................................49

    III.   Plaintiffs' state law discrimination claims against the Union are not preempted by the Railway Labor Act. .................................................................57

Conclusion ....................................................................................................61

Certificate of Compliance .........................................................................62

Certificate of Service ................................................................................63

TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adkins v. Mireles*, 526 F.3d 531 (9th Cir. 2008) .......................................59

*Alaska Airlines Inc. v. Schurke*, 898 F.3d 904 (9th Cir. 2018)...............58

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) .............................60

*Bart v. Golub Corp.*, 96 F.4th 566 (2d Cir. 2024)...................................49

*Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir. 1982) .......................52

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)...................................*passim*

*Boudreaux v. Louisiana State Bar Ass'n*, 86 F.4th 620 (5th Cir. 2023)............33, 43

*Bube v. Aspirus Hosp., Inc.*, 108 F.4th 1017 (7th Cir. 2024) ..................................19

*Carter v. Transp. Workers Union of Am., Loc. 556*, 602 F. Supp. 3d 956
   (N.D. Tex. 2022) .......................................................................52, 54

*Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115
   (9th Cir. 2000) .......................................................................22, 28

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) .........................................39, 47

*Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027 (9th Cir. 2005) ...12, 55

*Duarte v. City of Stockton*, 60 F.4th 566 (9th Cir. 2023) .......................................10

*Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108 (9th Cir. 2011)....................29, 39

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) .............13, 45, 46

v

*Employment Div. v. Smith*, 494 U.S. 872 (1990).....................................20

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132

    (9th Cir. 2001) .................................................................11

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)...........................48

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,

    82 F.4th 664 (9th Cir. 2023)................................................32

*Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d 1416 (9th Cir. 1995)..........58

*Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017)..................................59

*France v. Johnson*, 795 F.3d 1170 (9th Cir. 2015), *as amended on reh'g*

    (Oct. 14, 2015)...............................................................21

*Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154 (9th Cir. 2017).........................22, 25

*Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987)............................52, 55

*Groff v. DeJoy*, 600 U.S. 447 (2023).......................................46, 47, 50

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994) ........................58

*Heller v. EBB Auto Co.*, 8 F.3d 1433 (9th Cir. 1993) ......................13, 19

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022).........................48

*Lucky v. Landmark Med. of Michigan, P.C.*, 103 F.4th 1241 (6th Cir. 2024) ........19

*Manatt v. Bank of Am., NA*, 339 F.3d 792  (9th Cir. 2003)..............................28, 57

*Markham v. Wertin*, 861 F.3d 748 (8th Cir. 2017)................................59

*Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234 (N.D. Cal. 2004)............28

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).....................................11

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)........................................32, 55

*Murray v. UBS Sec., LLC*, 601 U.S. 23, 34 (2024) ...........................................14, 32

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ......................................................33, 43

*Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856 (9th Cir. 2011) ...............................10

*Passarella v. Aspirus, Inc.*, 108 F.4th 1005 (7th Cir. 2024)....................................19

*Peterson v. Wilmur Commc'ns, Inc.*, 205 F. Supp. 2d 1014 (E.D. Wis. 2002).......13

*Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185 (9th Cir. 2003)35, 37

*Redmond v. GAF Corp.*, 574 F.2d 897 (7th Cir. 1978)...........................................13

*Ricci v. DeStefano*, 557 U.S. 557 (2009).................................................................48

*Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894 (8th Cir. 2024) ..................20

*Sambrano v. United Airlines, Inc.*, 45 F.4th 877 (5th Cir. 2022)............................14

*Santillan v. USA Waste of California, Inc.*, 853 F.3d 1035 (9th Cir. 2017)............48

*Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944) .............................................59

*Thomas v. Rev. Bd.*, 450 U.S. 707 (1981) ...............................................................19

*Tunstall v. Brotherhood of Locomotive Firemen*, 323 U.S. 210 (1944).................59

*Vaca v. Sipes*, 386 U.S. 171 (1967).........................................................................59

*Vasquez v. City of Idaho Falls*, 778 F. App'x 415 (9th Cir. 2019) ........................47

*Wolfe v. BNSF Ry. Co.*, 749 F.3d 859 (9th Cir. 2014) ...........................................58

## STATUTES

28 U.S.C. § 1291 ................................................................2

28 U.S.C. §§ 1331, 1367 ....................................................2

42 U.S.C. § 2000e(j) ...................................................2, 11, 13

42 U.S.C. § 2000e-2(c) ...........................................50, 52, 59

42 U.S.C. § 2000e-2(m) ....................................................11

42 U.S.C. § 2000e-7 ...........................................................59

Or. Rev. Stat. § 659A.030(1)...........................................11

Or. Rev. Stat. § 659A.030(1)(c) ......................................60

Wash. Rev. Code § 49.60.180 ..........................................11

## OTHER AUTHORITIES

EEOC, 915.063, COMPLIANCE MANUAL ON RELIGIOUS DISCRIMINATION

   (Jan. 15, 2021) ....................................................13, 20, 50

## INTRODUCTION

Title VII prohibits employers and unions from discriminating against employees because of any aspect of an employee's religious beliefs, observance, or practice. Yet many employees continue to face discrimination at work because they hold traditional religious beliefs, such as the belief that there are only two sexes.

Plaintiffs-Appellants Marli Brown and Lacey Smith were exceptional flight attendants at Alaska Airlines ("the Airline"). The Airline encouraged its employees to engage in open dialogue by asking questions and sharing their diverse perspectives on Alaska's World, a private employee-only network. When the Airline posted its support for the proposed Equality Act, Plaintiffs each posted a comment based upon their religious beliefs. Brown's comment expressed her sincere religious beliefs that the Equality Act will negatively impact women, girls, and people of faith. Smith simply asked, "As a company, do you think it's possible to regulate morality?"

In response, an Association of Flight Attendants-CWA, AFL-CIO ("the Union") representative wrote that Brown and Smith should be thrown in "a burlap bag" and dropped in a well. The Union President reported Plaintiffs to Airline leadership for discipline. The Airline launched investigations, disparaged Plaintiffs' good faith religious beliefs, labeled the belief in only two sexes discriminatory, declared that employees are not entitled to their own beliefs on these issues, and fired them. All the while, the Airline violated its own procedures, treating Plaintiffs

worse than employees who made threats of violence and engaged in sexual harassment.

The district court erred by denying Plaintiffs' motion for summary judgment and granting Defendants' motions for summary judgment. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1367. On May 22, 2024, the court granted Defendants' motions for summary judgment and denied Plaintiffs' motion for partial summary judgment, 1-ER-3–65, entering judgment for Defendants, 1-ER-2. Plaintiffs filed a timely notice of appeal on June 17, 2024. 10-ER-2496; 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Title VII protects employees from discrimination on the basis of religion, which includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Alaska Airlines fired Brown and Smith for posting, on an employee network, comments that expressed or revealed their Christian beliefs related to the Equality Act. Brown and Smith's Union reported their comments to the Airline, disparaged their beliefs, and advocated against them. The issues presented are:

1. Did the district court err by narrowly defining "religion" to exclude comments that express or reveal religious beliefs?

2. Did the district court err by holding that there was not sufficient evidence to create at least a genuine issue of material fact as to whether Alaska Airlines discriminated against Brown and Smith on the basis of religion?

3. Did the district court err by holding that there was not sufficient evidence to create at least a genuine issue of material fact as to whether the Union discriminated on the basis of religion?

4. Did the district court err in holding that the claims against the Union under state employment discrimination laws that parallel Title VII were preempted by the Railway Labor Act?

### RELEVANT STATUTORY PROVISIONS

All relevant statutory authorities appear in the Addendum to this brief.

### STATEMENT OF THE CASE

## I.     Background

Plaintiffs Marli Brown and Lacey Smith are Christians who worked as flight attendants at Alaska Airlines for 8 years and 6 years respectively. 2-ER-137–38 ¶¶18–19; 2-ER-142–43 ¶¶89, 92; 2-ER-147–48 ¶¶195, 198. They were members of the flight attendants' Union. 2-ER-150–51 ¶¶18–19, 26–28. While at the Airline, Brown and Smith had warm friendships and good working relationships with flight

attendants of all beliefs and backgrounds. 2-ER-339–41 308:22–310:3; 3-ER-439–42 293:16–294:16, 315:16–316:19; 3-ER-588 79:21–25; 4-ER-682–84 96:24–97:15, 100:10–24; 4-ER-687–88 103:18–104:2; 4-ER-711 196:11–16; 4-ER-756 138:1–11; 6-ER-1473–75 ¶¶3, 7, 16; 6-ER-1431–33 ¶¶5, 8, 11–16; 7-ER-1687–88; 8-ER-1981 177:15; 8-ER-2016 294:8–16; 9-ER-2315–16 157:17–158:4. Brown and Smith were exceptional flight attendants. 4-ER-680–89 93:13–94:14, 96:24–97:15, 100:10–24, 101:3–103:1; 102:7–9, 103:2–105:6; 4-ER-712–33 210:20–211:14; 4-ER-898–04; 5-ER-1050; 6-ER-1320–21; 6-ER-1375 ¶14; 2-ER-375–76 (RFA 13–14).

Promising a culture of open dialogue, Alaska Airlines encouraged employees to have difficult, courageous conversations with each other and share diverse perspectives. 2-ER-139–41 ¶¶71, 83, 84; 5-ER-1012. The Airline's commitment to open dialogue meant that it allowed even critical comments on its internal employee-only communication network, Alaska's World, responding to many of these comments as an opportunity to "educate." 5-ER-1037–44; 5-ER-1032; 5-ER-1034; 5-ER-1057; 5-ER-1231–40; 3-ER-534–36 175:18–177:7; 3-ER-644 106:6–12; 3-ER-642–43 104:4–25, 105:17–24; 3-ER-655 131:19–22. The Airline's practice was to simply remove any comments that violated its policies. 3-ER-450 (RFA 11–13); 4-ER-836; 4-ER-742–43 25:4–26:2.

On February 25, 2021, Alaska Airlines posted on Alaska's World an article in

support of the proposed Equality Act and invited employees to comment and ask questions. 4-ER-916–30; 4-ER-826–27. Smith saw the article and had questions about the role of legislation in regulating morality and about how this proposed legislation would impact people like her because of her moral beliefs as a Christian. 6-ER-1383–84 ¶¶53–56, 61; 8-ER-1987 187:1–12; 8-ER-2059 502:16–22; 8-ER-2062 505:2–10; 7-ER-1577; 7-ER-1580–82; 7-ER-1584; 7-ER-1693. After reading the Commenting Rules, 4-ER-826–27, Smith commented: "As a company, do you think it's possible to regulate morality?" 4-ER-917. At first, the Airline did not remove her comment; instead, Andy Schneider (Senior Vice President of People) posted a response stating that the Airline's values require it to support the Equality Act and it "expect[s] our employees to live by these same values." *Id.*; 5-ER-1055–59; 4-ER-742–44 25:4–27:3.

When Brown independently saw the article, she decided to research the Equality Act. 6-ER-1434 ¶¶23–27. What she found concerned her, particularly the Act's potential impact on women, girls, and people of faith. 6-ER-1434–37 ¶¶27–39; 6-ER-1452–56. She spent the day researching and praying about what to do. 6-ER-1434 ¶28; 2-ER-343–46 25:5–28:14. She saw Schneider's response to Smith's question and hoped the Airline would respond to her concerns as well. 6-ER-1435 ¶32. Feeling compelled by the Holy Spirit to post, 2-ER-345–46 27:8–28:14; 4-ER-911; 2-ER-330 155:17–20; 6-ER-1458, she made the following comment:

5

Does Alaska support: endangering the Church, encouraging suppression of religious freedom, obliterating women rights and parental rights? This act will Force every American to agree with controversial government-imposed ideology on or be treated as an outlaw. The Equality Act demolishes existing civil rights and constitutional freedoms which threatens constitutional freedoms by eliminating conscience protections from the Civil Rights Act. The Equality act would affect everything from girls' and women's showers and locker rooms to women's shelters and women's prisons, endangering safety and diminishing privacy. Giving people blanket permission to enter private spaces for the opposite sex enables sexual predators to exploit the rules and gain easy access to victims. This is Equality Act.

4-ER-805.

When Union representative Terry Taylor (LEC President in Seattle) saw Brown's comment, she posted it in a Google Chat with other Union reps and wrote, "Can we PLEASE get someone to shut down comments, or put Marli and Lacey in a burlap bag and drop them in a well…. She needs to go!" 5-ER-1116–17.[1] Taylor later served as Brown's Union representative. 3-ER-401–02 (RFA 6–7). The Union's MEC President Jeffrey Peterson reported Brown's comment to Airline leadership, 5-ER-1060–62; 3-ER-530–32 167:1–169:15; 5-ER-1117, as he had for Smith's comment earlier in the day, 4-ER-935; 5-ER-1135; 3-ER-526–27 140:12–141:11. While reporting Brown's comment to the Airline, he criticized the religious "faith" of people like Brown as not "inclusiv[e]." 5-ER-1061. Peterson's report

---

[1] Taylor later edited her posts to remove the "burlap bag" remark, but her revision repeated the call for Brown to be fired: "She needs to go!" 5-ER-1117.

launched the Airline's disciplinary investigation into Brown. *See* 5-ER-1060–61; 5-ER-975–76; 7-ER-1563; 5-ER-1049; 8-ER-2388 157:6–21. The Airline then deleted Brown and Smith's comments from the article, shut down further comments, and began investigating both Plaintiffs. 5-ER-1061; 7-ER-1561.

On March 4, 2021, the Airline met with Brown. 4-ER-695–702 158:15–165:16; 4-ER-708–09 184:4–185:11; 4-ER-806–15; 4-ER-911–15. According to the Airline's Fact Finding Report, during the meeting, "Marli identified herself as a Christian who would be connected to the religious protected class," "Marli shared she loves her LBGTQ co-workers and that the company support[s] equity as it relates to them," and her intent was to ask about the impact of the Equality Act on other protected classes, namely religious people, women, and children. 5-ER-1052–53; 4-ER-695–702 158:15–165:16; 7-ER-1803 79:10–14; 8-ER-1815–16 161:16–162:5. Brown explained her concerns about the Equality Act were religious and requested a religious accommodation. 2-ER-331–35 156:5–160:13; 4-ER-695–96 158:15–159:3; 6-ER-1436–37 ¶¶37–38; 6-ER-1443 ¶¶72–73; *see also* 4-ER-914; 6-ER-1458–60; 7-ER-1803 79:10–14; 8-ER-1818 164:8–22; 8-ER-1827 189:7–19. Her supervisor Tiffany Lewis believed Brown was sincere and understood her to be sharing her perspective as a Christian on the Equality Act. 4-ER-690 117:10–24; 4-ER-695–96 158:15–159:3; 4-ER-721–22 257:25–258:12. Lewis recommended Brown be given no discipline. 4-ER-714 212:9–22.

The Airline met with Smith on March 11, 2021. 4-ER-901–09; 6-ER-1385–87 ¶¶ 69–84. At that point, Smith and her Union representative did not know what the Airline's concerns with her comment were. 2-ER-229 14:4–24; 2-ER-222 17:12–13. The Union advised her to say that she was "just asking a question." *Id.* 15:13–14. At the meeting, the Airline's investigators repeatedly asked Smith what her comment meant. 4-ER-905; 4-ER-960. Smith said it was a philosophical question about the law and morality. *Id.*; 4-ER-905; *see also* 4-ER-962; 8-ER-1971–72 160:20–161:2. When asked whether the question could be seen as "undermining the rights of LGBTQ community," she said that that there were things she disagreed with in the Equality Act, but she opposes discrimination and supports human rights and dignity. 4-ER-961. Smith feared religious discrimination if she volunteered more information about her Christian faith. 6-ER-1383 ¶¶54–56; 6-ER-1386 ¶78; 8-ER-2002–03 208:8–209:1; 8-ER-2006–08 219:9–221:5. The aggressive questioning brought Smith to tears. 8-ER-1999 205:15–22; 6-ER-1385–87 ¶¶70, 81.

On March 19, 2021, the Airline gave Plaintiffs their Notices of Discharge ("NOD"). 4-ER-828–30; 4-ER-898–900. Smith's NOD explained for the first time that the Airline was firing her because of her moral beliefs. 4-ER-898 ("Defining gender identity or sexual orientation as a moral issue ... is not a philosophical question, but a discriminatory statement."). Smith viewed the NOD as targeting her because of her religious beliefs about morality. 6-ER-1388 ¶89; 6-ER-1890 ¶104;

8

*see also* 7-ER-1577; 8-ER-1939 80:4–6; 8-ER-1963 131:8–18; 8-ER-2012–13 244:14–245:10.

The Union filed grievances for Brown and Smith. Smith argued during her grievance hearing that the Airline was engaging in religious discrimination and asked for a religious accommodation. 7-ER-1577–82; 7-ER-1584–85; 7-ER-1693–94. Brown wanted to give a statement at her hearing about religious discrimination, but the Union convinced her not to. 6-ER-1445–46 ¶¶80–86; 3-ER-510–12 27:18–29:5; 4-ER-838–41. At Brown's grievance hearing, the Union did not make any arguments about religious discrimination. 3-ER-401–02 (RFA 7); 2-ER-146 ¶155. Under the collective bargaining agreement ("CBA"), termination is not final until the grievance is denied. 4-ER-882, §§ C.1 & C.7. The Airline denied Plaintiffs' grievances and refused to grant them a Last Chance Agreement ("LCA") to be conditionally reinstated. 5-ER-1063–64; 4-ER-773–74 27:16–28:1, 28:16–24. The Union refused to represent Plaintiffs at arbitration. 6-ER-1338–41.

## II.    Procedural History

Plaintiffs timely filed their EEOC charges, state charges, and Complaint. Dkt. No. 1, Compl., Exs. 5, 6, 7, 8. On November 23, 2022, the court granted the Union's motion to dismiss the state law claims against the Union based upon federal preemption. 1-ER-66–75. On May 22, 2024, the court granted Defendants' motions

for summary judgment and denied Plaintiffs' motion for partial summary judgment. 1-ER-2. Plaintiffs timely appealed. 10-ER-2496.

## SUMMARY OF ARGUMENT

The lower court erred, as a matter of law, by incorrectly defining the scope of religious discrimination and misapplying legal standards to evaluate the evidence. Although Title VII forbids discrimination based upon any aspect of religious belief, practice, or observance, the court excused discrimination based upon religious comments. Plaintiffs presented sufficient evidence for a reasonable jury to find that the Airline fired Plaintiffs (and the Union attempted to get Plaintiffs fired) because of comments that expressed or revealed their religious beliefs. The court also misapplied federal preemption doctrine to immunize unions from state law employment discrimination claims. This Court should reverse the decision below.

## STANDARD OF REVIEW

This Court reviews *de novo* orders granting motions to dismiss and motions for summary judgment. *Duarte v. City of Stockton*, 60 F.4th 566, 570 (9th Cir. 2023). For summary judgment, the Court "determine[s], viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). On cross-motions, the court is required to consider all evidence presented by any of the parties.

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

**ARGUMENT**

### I. Plaintiffs presented sufficient evidence that Alaska Airlines discriminated against Plaintiffs because of their religious beliefs.

Title VII claims[2] require a showing that an employer fired an employee, or otherwise discriminated, "because of" religion under a "but-for" causation standard.[3] *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). Under this standard, religion need not be the only, or even the primary, "but-for" cause of an adverse action. *Id.* at 665. Religion merely must be *one* "but-for" cause of the adverse action for liability to attach. *Id.* Plaintiffs provided sufficient evidence to create at least a genuine issue of fact as to whether Alaska Airlines fired them because of an aspect of their religious beliefs, practices, or observances. 42 U.S.C. § 2000e(j).

Title VII claims do not require Plaintiffs to proceed through the *McDonnell Douglas* burden-shifting framework to overcome summary judgment. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Instead, Plaintiffs may simply produce

---

[2] Plaintiffs preserve their analogous claims under Wash. Rev. Code § 49.60.180 and Or. Rev. Stat. § 659A.030(1). As the district court held below, the same standards apply. 1-ER-13.

[3] Title VII also provides that an employer can be liable even in the absence of "but-for" causation, if it acted with an improper motive. *Bostock*, 590 U.S. at 656–57; 42 U.S.C. § 2000e-2(m). As explained herein, both causation standards are met.

"sufficient evidence" that the employer discriminated on the basis of religion, regardless of whether that evidence is classified as "direct or circumstantial." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 851–55 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003); *see also McGinest*, 360 F.3d at 1122.[4] "As long as a reasonable factfinder could conclude that discrimination occurred, summary judgment must be denied." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

The district court failed to properly apply this standard. It erred by improperly defining religious discrimination, by improperly applying *Bostock*'s but-for causation test in the context of religious discrimination, by improperly labeling Plaintiffs' direct evidence of discrimination as circumstantial evidence and then ignoring that evidence entirely, by requiring circumstantial evidence to be "substantial" rather than sufficient, by analyzing evidence in isolation rather than cumulatively, by failing to properly analyze Defendants' rationales, and by not viewing the evidence in the light most favorable to Plaintiffs.

### A. The lower court erred, as a matter of law, by narrowing the definition of religious discrimination.

The primary error in the lower court's opinion is that it erroneously defined

---

[4] Plaintiffs also succeed under *McDonnell Douglas*. *See* 1-ER-32 n.3. Defendants' asserted rationales are pretextual and not legitimate or non-discriminatory. *See infra* Parts I.D-F, II.A-D.

the scope of discrimination on the basis of "religion." Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief."[5] 42 U.S.C. § 2000e(j). "The language chosen is broad—broader can hardly be imagined." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993); *accord* EEOC, 915.063, COMPLIANCE MANUAL ON RELIGIOUS DISCRIMINATION (Jan. 15, 2021), §12-I.A ("Religion is very broadly defined for purposes of Title VII."). The language forbids discrimination based upon religious practice as well as religious beliefs. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774–75 (2015). Employers may not discriminate against religious practices regardless of whether those practices are "specifically mandated by an employee's religion." *Heller*, 8 F.3d at 1438; *see also Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978) (holding "religiously motivated" conduct is protected). Religion thus includes far more than an employee's religious affiliation. Employers may not discriminate based upon *any* aspect of religious belief or practice.

The lower court erred by holding that religious comments do not fall within this broad definition of religion. It concluded, "Given the evidence in the record, the only reasonable inference that one can draw is that Alaska did not terminate

---

[5] The definition also requires employers to reasonably accommodate employee religious observance and practice absent undue hardship. 42 U.S.C. § 2000e(j). The text does not provide an undue hardship defense when an employer discriminates because of an employee's religious beliefs. *See id.*; *Peterson v. Wilmur Commc'ns, Inc.*, 205 F. Supp. 2d 1014, 1020 (E.D. Wis. 2002).

Plaintiffs because of their religion, but because of the comments they posted." 1-ER-15. But this misses the point. All parties agree that Alaska Airlines fired Plaintiffs because of the comments they posted. 4-ER-828–30; 4-ER-899–900. What the court failed to acknowledge is that the Airline fired Plaintiffs because the comments reflected their religious beliefs, which are beliefs the Airline disdains.[6] It is religious discrimination to fire employees because the employer dislikes their religious beliefs. *See Sambrano v. United Airlines, Inc.*, 45 F.4th 877, 878–79 (5th Cir. 2022) (Ho, J., concurring) ("Imagine that your employer suddenly declares that he finds one of your religious beliefs offensive. It could be your view on abortion, or marriage, or sexuality, or gender, or any number of other religious tenets. Your view has no economic impact whatsoever on the company. But it offends the sensibilities of the executives who populate the C-suite.… Being placed on indefinite unpaid leave because your employer doesn't like your religious beliefs is obviously an adverse employment action and an actionable claim under Title VII of the Civil Rights Act of 1964."). Under Title VII, an employer may no more fire an employee for revealing her religious beliefs than it may fire an employee for revealing her sexual orientation. *See Bostock*, 590 U.S. at 653 (employees fired after revealing

---

[6] Although evidence of animosity can be probative of discrimination, Plaintiffs are not required to prove that the employer acted with hostility or animosity. *Murray v. UBS Sec., LLC*, 601 U.S. 23, 34 (2024) ("the presence of 'malevolent motive'" is not required to prove discrimination). The lower court erroneously required hostility or intolerance. 1-ER-28–31.

14

their sexual orientation or gender identity).[7]

Plaintiffs prevail under *Bostock*'s test for but-for causation. "That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Id.* at 656. If changing an employee's sex would change the outcome, then sex discrimination occurred. *Id.* Applying that test here, if changing Plaintiffs' religion (defined as all aspects of religious observance, practice, and belief) means that Alaska Airlines would not have fired them, then religious discrimination occurred. If Brown and Smith held different religious beliefs or none at all, then they would not have posted comments reflecting their religious beliefs and would not have been fired. This satisfies *Bostock*'s test.

The lower court erroneously concluded that changing Plaintiffs' religion (which presumably meant changing only their religious affiliation) would not alter the content of the comments that they posted. 1-ER-15–16. But, because religion is defined to include religious practices as well as beliefs, their practice (the religious expression) must change as well. To illustrate: Under the lower court's flawed reasoning, it would not be religious discrimination to fire a Christian employee for posting that "Jesus is God" because she also would have been fired if she were a

---

[7] Whether the Airline fired Plaintiffs for their religious beliefs, for revealing their religious beliefs, for suggesting that they hold certain religious beliefs, or for expressing their religious beliefs, all these formulations are covered by the broad definition of religion.

non-Christian who posted "Jesus is God." This is, of course, an incorrect application of the test. Simply put, being fired because of a religious comment is religious discrimination.

*Bostock* explains that Title VII focuses on discrimination against individuals. 590 U.S. at 658. Under the but-for test, it does not matter if an employer would also fire other employees of different religions or no religion for posting similar comments. *Id.* at 662 ("An employer musters no better a defense by responding that it is equally happy to fire male and female employees who are homosexual or transgender. Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII."). If the but-for test is satisfied for the *individual* employee, that is all that matters. *Id.* at 661.

The but-for standard is capacious. *See id.* at 667 ("You can call the statute's but-for causation test what you will—expansive, legalistic, the dissents even dismiss it as wooden or literal. But it is the law."). Firing an employee because the employer dislikes her Christian beliefs about sex or gender identity clearly falls within the covered scope of Title VII. Therefore, the lower court erred by holding that employers who discriminate based upon employees' religious comments are not

16

engaging in religious discrimination.

**B. The lower court erroneously held that some of Brown's beliefs were not religious, contrary to Brown's testimony and other record evidence.**

The evidence indisputably proves that Brown's beliefs were religious. Brown wrote in her sworn statement that she is a Christian who follows the Bible, and she tries "to live out the Bible's instruction to 'do justice, love mercy, and walk humbly with [my] God.' (Micah 6:8)." 6-ER-1432 ¶9; *see also* 2-ER-327 51:13–22. Her "religious faith compels [her] to help the needy and stand up for the oppressed." 6-ER-1431 ¶4; *see also* 2-ER-324 47:8–11; 2-ER-337–38 232:15–233:12.

Brown testified that she prayed about how to respond to the Equality Act article. 2-ER-343–45 25:14–27:11; 6-ER-1434 ¶28. She testified that the Holy Spirit "spoke to [her] clearly," telling her to post her comment speaking up for women, girls, and people of faith who could be harmed by the Act. 2-ER-345–46 27:8–28:14. She "felt very compelled by [her] religious beliefs" to post. 2-ER-330 155:17–20; 6-ER-1458. She explained, "The Bible says to stand up for those who are vulnerable, and women and children -- women and girls, and my female flight attendants, are vulnerable when they're in a position to where they can be seen by the opposite sex while changing." 2-ER-331 156:16–20; *see also* 2-ER-331–35 156:5–160:13; 4-ER-695–96 158:15–159:3; 6-ER-1436–37 ¶¶37–38; 6-ER-1443 ¶¶72–73; 7-ER-1803 79:10–14; 8-ER-1818 164:8–22; 8-ER-1827 189:7–19. She testified that her beliefs

17

about women as a sex are rooted in biblical teachings from Genesis. 2-ER-333–34 158:14–159:1. She testified that there were "scriptures throughout the Bible" about standing up for the vulnerable and explained that she had a "conviction" in her heart to do so here. 2-ER-332–33 157:20–158:2; *see also* 8-ER-1827–28 189:7–190:9; 2-ER-336 223:5–13 (reciting Micah 6:8).

This evidence shows Brown held religious beliefs rooted in Genesis about the nature of male and female, that she believed the Bible called her to stand up for the vulnerable, including women and children, and that she felt specific conviction by the Holy Spirit to speak out in defense of women, children, and people of faith in response to the Airline's Equality Act article.

Yet the court erroneously concluded that Brown did not present sufficient religious grounding for her beliefs to be considered religious. The court took one of Brown's religious beliefs (the biblical call to care for the vulnerable), considered it in isolation, and concluded that it is not a religious belief. 1-ER-20. The court wrote that "Brown was unable to point to any specific passage in the Bible, teaching of her religious leaders, or other religion-specific source for this principle." *Id.* The court ignored the fact that Brown did explain the religious foundation for her beliefs as rooted in Scripture and prayer. The testimony that she prayed, received a response from the Holy Spirit, and acted accordingly is sufficient religious grounding to show that her beliefs and actions are religious. *Lucky v. Landmark Med. of Michigan, P.C.*,

103 F.4th 1241, 1243 (6th Cir. 2024) ("Those are allegations of particular facts—she prayed, she received an answer, she acted accordingly" sufficient to plead religious observance or belief).

It is improper for the lower court to hold that because Brown did not initially recite chapter and verse that her belief was "too vague to be considered 'religious' for purposes of Title VII." 1-ER-20. The Supreme Court has repeatedly cautioned that "[c]ourts should not undertake to dissect religious beliefs ... because [they] are not articulated with the clarity and precision that a more sophisticated person might employ." *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1010 (7th Cir. 2024) (quoting and applying in Title VII context *Thomas v. Rev. Bd.*, 450 U.S. 707, 715 (1981)); *see also Bube v. Aspirus Hosp., Inc.*, 108 F.4th 1017, 1019–20 (7th Cir. 2024). Brown was correct that there are many Bible verses that call for Christians to care for the vulnerable. 2-ER-336 223:5–13; *see also, e.g.*, *James* 1:27.

The court also concluded that Brown's belief is not a religious belief because caring for the vulnerable is a "universal human precept," ignoring warnings that it is improper for courts to determine the tenets of a particular religion.  *See Heller*, 8 F.3d at 1438; *Passarella*, 108 F.4th at 1010. The "Supreme Court has warned, '[r]epeatedly and in many different contexts,' that 'courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.'" *Lucky*, 103 F.4th at 1244 (quoting *Employment Div. v. Smith*, 494 U.S. 872,

19

887 (1990)). The lower court cited nothing to support its proposition that religious beliefs are not protected if they are "universal human precepts." 1-ER-20. It is not for courts to define which beliefs are "universal" and therefore do not count as religious.

It is also inappropriate for the court myopically to focus on only one portion of Brown's religious beliefs while ignoring the rest of the foundation for her religious beliefs. *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901–02 (8th Cir. 2024) (quoting EEOC COMPLIANCE MANUAL, §12-I(A)(1) ("[O]verlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system."). Brown's testimony shows her religious beliefs are part of her comprehensive belief system as a Christian, not simply universal human precepts.

Importantly, the court also ignored record evidence showing that Defendants understood Brown to be expressing her religious perspective as a Christian on the Equality Act. *See infra* Part I.D.1. The evidence is so indisputable that the Union conceded that Brown "held sincere religious opposition to the Equality Act." 2-ER-158–59 n.8 (AFA Mot. Summ. J.).

### C. The lower court erred by using incorrect evidentiary standards and misapplying the facts.

The lower court erred by applying a heightened evidentiary standard for circumstantial evidence, by failing to consider evidence, and failing to view

evidence in the light most favorable to Plaintiffs.

First, the lower court erred by requiring a heightened showing for circumstantial evidence, requiring such evidence to be "specific" and "substantial." 1-ER-22. The Ninth Circuit cases that applied this standard are superseded by the Supreme Court in *Desert Palace v. Costa*, 539 U.S. 90 (2003). The *Costa* Court held that Title VII applies the conventional rule of civil litigation that requires a plaintiff to prove his case "by a preponderance of the evidence," using "direct or circumstantial evidence." *Id.* at 99. The conventional rule requires "treating circumstantial and direct evidence alike." *Id.* at 100; *see also France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015).

Second, the court erred by ignoring evidence entirely in its discussion of circumstantial evidence. The lower court concluded that Plaintiffs' evidence was not "direct evidence" of discrimination because "additional inferences" would be required to show discrimination. 1-ER-16; *see also* 1-ER-14–22. The court then failed to mention any of this evidence in its discussion of circumstantial evidence. *See* 1-ER-27–28 (listing the circumstantial evidence considered). In effect, the court erroneously concluded that because certain evidence was not "direct evidence," it was to be given no consideration at all. This is error. The lower court also erred by considering none of the evidence of the Airline's anti-religious hostile work environment in addressing Plaintiffs' disparate treatment claims, despite Plaintiffs'

21

express incorporation. 2-ER-300 n.12.

Third, the court erred by failing to view the evidence in the light most favorable to Plaintiffs. The "judicial duty at the summary judgment stage" requires drawing "all inferences from the evidence in the light most favorable" to Plaintiffs. *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1165 (9th Cir. 2017). Nowhere in the opinion did the lower court state that it was viewing the evidence in the light most favorable to the Plaintiffs. *See generally* 1-ER-13–64. It is evident from the opinion that the lower court did not do so.

There is sufficient evidence for a reasonable jury to find religious discrimination by a preponderance of the evidence, which must be considered in totality and in the light most favorable to Plaintiffs.

### D. There is sufficient evidence that the Airline fired Marli Brown because of her religious beliefs.

The Airline admitted it fired Brown because of one comment she made on Alaska's World that the Airline understood to be an expression of her religious beliefs. This is direct evidence, sufficient to proceed to trial. *See Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

But there's more. The Airline's culture was hostile to Christianity. The Airline applied its harassment policies in a discriminatory way against Christians – giving harsh discipline for expression of Christian beliefs and little-to-no discipline to flight attendants who harassed or threatened Christians. The Airline's extreme reaction to

Plaintiffs' comments contradicted its own policies about open dialogue, progressive discipline, and the Alaska's World Commenting Rules. After Plaintiffs were fired for their comments, the Commenting Rules were changed to prohibit "religious" comments. The Airline's intolerance toward Plaintiffs' religious beliefs was so extreme that their comments were not simply taken down, they were fired.

**1. The Airline fired Brown because of one comment, and the Airline understood that comment to be an expression of her Christian beliefs.**

The Airline fired Brown because of her comment on Alaska's World. 2-ER-353–54 (RFA 1–2); 4-ER-776–77 30:15–31:17; 4-ER-828–30; 4-ER-725–26 271:19–272:16. She had no prior discipline. 2-ER-359–60 (RFA 13–14); 4-ER-740.

Brown explained to the Airline that her comment was a sincere expression of her religious beliefs. 6-ER-1434 ¶28; 2-ER-343–46 25:5–28:14; 6-ER-1458–60. The text of the comment was expressly religious, referring to "the Church" and "religious freedom." 4-ER-805.

The Airline and the Union understood Brown's comment to be religious. Tiffany Lewis, the supervisor who signed Brown's NOD, testified that she believed Brown was expressing her views as a Christian woman and believed her to be sincere. 4-ER-721–22 257:25–258:12; 4-ER-690 117:10–24 (Brown explained "where she stands as a Christian woman in regards to the Equality Act"); 4-ER-695–96 158:15–159:3 (Brown posted "her views on the Equality Act as a Christian woman"); 4-ER-830.

23

Carmen Williams (VP of Inflight), the person who made the decision to fire Brown, knew Brown's comment was religious. She testified, "if you read her comment, you can -- you can tell that she's talking about religious concerns that she may have." 4-ER-771 16:4–8; *see also* 4-ER-771–72 16:14-17:19; 4-ER-778–80 32:22–33:9, 33:10–34:2. The Airline's internal investigation reported that "Marli identified herself as a Christian who would be connected to the religious protected class." 5-ER-1052.

The Union also found Brown's comment to be "self-evident[ly]" from her religious convictions. 3-ER-533. In its briefing, the Union conceded that Brown "held sincere religious opposition to the Equality Act." 2-ER-158–59 n.8 (AFA Mot. Summ. J.), and Brown "posted [her] comments out of a religious conviction that she should stand up for the vulnerable, which, in her view, includes women and girls," 6-ER-1370 (AFA Opp. to Pls.' Mot. Summ. J.); *see also* 6-ER-1371.

This is more than enough evidence to send the issue of religious discrimination to the jury. By analogy, if an employer fired an employee for only one comment in which she revealed her sexual orientation, there is at least a factual question for the jury about whether the employer fired her because of sexual orientation. This is true even if the employer put forth other purported reasons for the termination, such as arguing that coworkers found her comment about her sexual orientation offensive.

24

The lower court never explained why this evidence is insufficient. The court only held that an extra inference would be required to show religious discrimination. 1-ER-16, 17, 18, 19, 21. The court did not explain what extra inference would be required nor why a jury could not have drawn the inference. After all, at this stage, all reasonable inferences must be drawn in favor of Plaintiffs. *Fuller*, 865 F.3d at 1165.

**2. Plaintiffs' terminations were part of a larger pattern of hostility toward religion in general and Christianity in particular.**

At the Airline, Christian employees feared for their jobs and were afraid to mention their religious beliefs in the workplace. 3-ER-496 ¶18; 3-ER-498–99 ¶¶8–10; 3-ER-504–05 ¶16; 3-ER-506–07 ¶7; 5-ER-983–85; 6-ER-1449–50 ¶¶105–07; 6-ER-1393–94 ¶114, 123; *see also* 5-ER-994–96. The Airline did nothing to respond to many employee complaints about religious discrimination or a religiously hostile work environment. 5-ER-1068–79; 5-ER-1241–49; 3-ER-535–37 212:13–214:24.

The Airline created an environment where its employees and supervisors were ignorant about employees' statutory right to be free from religious discrimination. 4-ER-735–36 293:8–294:10; 4-ER-723–24 259:24–260:7; *see also* 9-ER-2307–08 183:22–184:13; 3-ER-565 212:9–12. The Airline's religious discrimination training was so deficient that Brown's supervisor Tiffany Lewis confidently testified during

her deposition that religion was <u>not</u> a protected class.[8] 4-ER-735–46 293:8–294:10; 4-ER-727–28 277:20–278:16. The Airline often omitted religion from the list of protected classes that it "respect[s]." 3-ER-568–84 215:4–231:14; *see, e.g.*, 4-ER-868; 4-ER-873; 5-ER-1180–81; 5-ER-1232; 6-ER-1502; 3-ER-656–57 139:6–140:12.

The Airline's supervisors, policies, and the Union suppressed religious expression at work. 4-ER-861–62; 3-ER-562–64 209:20–211:7; 4-ER-939; 3-ER-661–66 19:21–21:21, 22:5–24:24. The Airline took controversial positions on social issues, demanded employee agreement or silence, and failed to respect religious objections. 8-ER-1981–84 177:3–180:2; 5-ER-1055; 5-ER-1241–49 (compiling complaints); 3-ER-501 ¶¶22–26; 6-ER-1393 ¶114; 8-ER-2031–32 322:9–323:10; 3-ER-612–13 38:2–39:12. The Airline cultivated a culture where employees, including and especially Union representatives, felt comfortable disparaging Christians. *See, e.g.*, 6-ER-1295–1301 (compiling comments); 5-ER-1116; 5-ER-1145–47; 4-ER-2891; 4-ER-910; 5-ER-1150.

### 3. The Airline applied its harassment policies in a discriminatory way against Christians.

The Airline harshly punished Christian flight attendants accused of harassment while giving little-to-no discipline to flight attendants who harassed or

---

[8] After speaking with counsel during a break, Lewis changed her testimony. 4-ER-733–34 290:2–291:6.

threatened Christians. 3-ER-496 ¶¶15–16. The Airline disciplined Christian flight attendant "J.D." with a 5-day suspension for posting on social media about Derek Chauvin with several hashtags including "#PRAYFOROURPOLICE." 3-ER-494–96 ¶¶4–6, 8; 7-ER-1708–10. J.D. was required to undergo diversity training that omitted religion from the list of protected classes the Airline "respect[s]." 3-ER-495 ¶¶10–11; 7-ER-1710; 6-ER-1497–504; 6-ER-1500. The Airline disciplined Christian flight attendant "M.M." with a 3-day suspension for her social media post saying that all lives matter. 3-ER-503–04 ¶¶6, 13; 7-ER-1715–18; 8-ER-1850–51 248:1–249:4; 8-ER-1944 99:4–16. The lower court did not discuss these suspensions.

By contrast, the Airline gave little-to-no discipline when flight attendants engaged in anti-Christian harassment. When a flight attendant ("J.R.") was accused of anti-Christian "hate speech" and making a "direct threat of violence" on his social media using the Alaska Airlines logo in his cover photos, he was given the lowest level of discipline, a confirmation of oral warning. 4-ER-952; 4-ER-958 (posting "Any Christian that thinks like this should have their teeth kicked in!"); 4-ER-957; 5-ER-1143; 3-ER-406–07 (RFA 24). A customer complained about J.R.'s post, saying he would not fly with the Airline again. 4-ER-952; 7-ER-1758.

Similarly, when flight attendant ("H.B.") harassed a coworker on social media because of her pro-life religious beliefs and taunted her about praying, he was

investigated but given no discipline. 3-ER-595–96 116:19–117:22; 3-ER-605–09 179:15–183:20; 5-ER-1092–103.

The lower court erroneously dismissed these (and other) comparators by arguing that these flight attendants made their online comments on social media rather than on the employee-only Alaska's World platform. 1-ER-24–25. The court viewed the evidence in the light most favorable to the Airline, inferring that comments that could only be seen by other employees are somehow worse than posts that could be seen by the public. A reasonable juror could conclude that public social media posts are more harmful because "these types of posts represent a risk to [its] brand." 4-ER-957. After all, J.R.'s social media account used the Airline's logo in his profile pictures and his threat against Christians led to an actual customer complaint. *See Chuang*, 225 F.3d at 1129 ("It is not the province of a court to spin such evidence in an employer's favor").

The lower court also erroneously dismissed H.B. by suggesting that he was an employee who "said something objectionable to only a single other employee." 1-ER-24. But evidence of harassment targeted at a specific person is typically viewed as more serious and harmful than a general statement that a hearer finds offensive. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (contrasting overheard offensive jokes with ones directed at the plaintiff); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1252 (N.D. Cal. 2004) (same). There is no

28

reason why a jury cannot make this inference here.

The evidence shows the Airline applied its harassment policy in a discriminatory way against Christians. *See Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) ("triable issue of pretext" shown through evidence of "an employer's deviation from established policy or practice").

### 4. In response to Plaintiffs' comments, the Airline changed its Commenting Rules to forbid "religious" comments.

The Airline's treatment of Plaintiffs violated its Alaska's World Commenting Rules. Under the "Three Strikes" policy, if the Airline disliked a comment, it simply removed the comment. 4-ER-826–27. If it removed three comments, the employee would be barred from future commenting. 4-ER-826. If the Airline followed this policy, it would have simply removed their comments.

At the time, the Airline did not discipline Alaska's World commentors, even for critical or offensive comments. Alaska Airlines received complaints that comments on previous Alaska's World articles were perceived as offensive, racist, or hurtful. *See, e.g.*, 5-ER-1037–44 (BLM Article); 5-ER-1231–40 (DEI Racial Equity Article); 5-ER-1032–33; 5-ER-1237 (complaining about the "thinly veiled racist" comments on racial equity article); 3-ER-641–45 101:1–11, 104:4–25, 105:17–24, 108:12–17; 3-ER-655 131:19–22 (racial equity article comments made employees feel hurt or unsafe); 5-ER-1044 ("J.C." complaining about comments minimizing "pain and trauma" of Black people); 5-ER-1055 (calling several

29

comments on the racial equity article "microaggressions"); 7-ER-1763 (comparing comments on racial equity and Equality Act articles); 6-ER-1302 (same). The commenting rules and harassment policies applied to all employees, 4-ER-826–27; 6-ER-1463–67; 6-ER-1376 ¶19, but Alaska Airlines did not terminate or even discipline employees other than Plaintiffs for commenting on Alaska's World. 2-ER-358–59 (RFA 9–10); 3-ER-450 (RFA 11–13); 7-ER-1787–88. One flight attendant ("L.B.") was disciplined for her Alaska's World posts in 2016 and 2017. 2-ER-182–88. But, unlike Brown, she was given multiple opportunities to correct. 2-ER-180–88; 4-ER-766–67 263:25–264:9.

The lower court erroneously dismisses these comparators because most of these commentors were not flight attendants. But all of these commentors were employees, subject to the same policies about Alaska's World commenting and the same anti-discrimination and harassment policies. 4-ER-826–27; 6-ER-1463–67; 6-ER-1376 ¶19. Among these examples, there was even one flight attendant ("G.N.") who made a non-religious comment that violated the company's harassment policies on Alaska's World just one week prior to Plaintiffs and was not disciplined.[9] But the court dismissed even this comparator as not "substantial." 1-ER-26. More

---

[9] G.N.'s comment criticized the Airline's racial equity goals and included the phrase, "I see no color." 5-ER-1237. According to Alaska's training materials, the phrase "I don't see color" is a microaggression and violates their harassment policies. 6-ER-1502; 10-ER-2479–83.

fundamentally, a reasonable jury could consider all the evidence about how the Airline applied its policies to conclude that it significantly deviated from them.

Schneider then changed the Commenting Rules in response to Plaintiffs' comments. 4-ER-973. After receiving a complaint from a pilot ("Pilot G.") about the Airline's disciplinary response to Brown's comment, Brad Tilden (the retiring CEO of Alaska Airlines) advised Schneider not to censor Christian employees. 5-ER-1034 ("His [Tilden's] message to me is that we not sensor [sic] people for having conservative Christian views"); 5-ER-983–85 (Pilot G. email to CEO); 3-ER-636–37 76:6–77:21. Schneider promptly disregarded that message. She approved changes to the Commenting Rules to expressly prohibit future "partisan or personal (such as religious or political) opinions" and to remove the Three Strikes Policy. 4-ER-861–62; 2-ER-358 (RFA 6-8); *see also* 9-ER-2146–48 62:20–64:15. These changes meant that comments from "conservative Christian[s]" like Pilot G. would not be permitted. 6-ER-1322–24 ("someone like Pilot [G.] would be expected not to comment"); 6-ER-1325–27 (same). These changes were made in direct response to Plaintiffs' comments, permitting the reasonable inferences that the Airline viewed Plaintiffs' comments as religious and that they viewed Plaintiffs' comments as impermissible because they expressed conservative Christian views.

The Airline later falsely claimed to the EEOC that Plaintiffs violated the version of the Commenting Rules that went into effect after and because of Plaintiffs.

6-ER-1357–65; 3-ER-448–49 (RFA 5–8); 3-ER-557–64 204:13–211:8; *compare* 4-ER-826–27 *with* 5-ER-1065–66.

The court's opinion did not address most of these arguments. Instead, it lumped some of Plaintiffs' circumstantial evidence together and concluded that it was not "substantial enough" and did not show "intolerance or hostility toward Plaintiff's religion." 1-ER-28. This is the wrong legal standard because Title VII does not require hostility or intolerance, *Murray*, 601 U.S. at 34, and circumstantial evidence does not need to be "substantial." *See infra* Part I.C. The cumulative evidence is enough for a reasonable jury to find discrimination.

### 5. The Airline showed hostility toward Plaintiffs' religious beliefs, defining them as discriminatory and falsely disparaging Brown as hateful.

Although Alaska Airlines knew Brown was sincerely expressing her concerns as a Christian woman about the Equality Act, it disparaged her beliefs as "hateful," "offensive," and "discriminatory." 4-ER-829. The Airline's disparaging of Plaintiffs' good faith beliefs shows anti-religious hostility. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 692–93 (9th Cir. 2023) (en banc); *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021) ("[T]he university derided him and equated his good-faith convictions [Christian beliefs about gender] with racism. An inference of religious hostility is plausible in these circumstances.").

Alaska Airlines considered Brown's good faith religious belief that there are

only two sexes to be discriminatory. Williams testified that Brown's comment violated the Airline's discrimination policies, at least in part, because Brown used the term "opposite sex." 4-ER-780–81 34:18–35:5. She testified that the term is discriminatory. 4-ER-780 34:21–25.

The belief in only two sexes is a widely-shared Christian belief. 6-ER-1483–86 ¶¶2–5, 9 (expert report of Dr. Mauser). It is well known, indeed "obvious," that many Christians hold such religious beliefs. *See* 2-ER-179 (AFA's Mot. to Exclude Expert Test.); *Boudreaux v. Louisiana State Bar Ass'n*, 86 F.4th 620, 635 (5th Cir. 2023); *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015).

The Airline knew that many employees hold religious beliefs related to gender, sexuality, and the Equality Act. The Airline's Social Issues Engagement Platform stated: "We understand this issue [the Equality Act] touches on religious freedom concerns for some." 5-ER-1031. It repeated this understanding often. 6-ER-1303–07; 6-ER-1311–17; *see also* 5-ER-991. "[W]e knew that there [were] religious concerns that were continuing to come up." 3-ER-638–40 80:12–82:21. Executive Joseph Sprague, the President of Horizon Air, a member of the Alaska Air Group, wrote to Schneider and other Executives explaining that a large percentage of employees have religious concerns about the Equality Act. 5-ER-1001–08.

The lower court erroneously failed to give this evidence any weight by arguing that the belief that there are only two sexes is "neither unique to, nor a particular

tenet of, Christianity specifically or religion more broadly." 1-ER-21. Christian beliefs do not have to be "unique" to Christianity to merit protection against religious discrimination. It would be similarly discriminatory to apply this policy to a Muslim or a Jewish employee who held the religious belief in only two sexes. In any event, the Airline knew that Brown held this belief for religious reasons and still concluded that Brown violated Airline policy. A reasonable juror could conclude that the Airline discriminated against Brown, at least in part, for revealing her good faith Christian belief that there are only two sexes.

The other reason Williams gave for why the Airline considered Brown's comment to be discriminatory was also based on Brown's good faith religious beliefs. Williams testified that it was discriminatory for Brown to express her "safety concerns" about the Equality Act. 4-ER-780–81 34:3–35:5. Brown's comment voiced her religious beliefs about protecting women and girls from "sexual predators" who may "exploit the rules" to gain access to female safe spaces, such as locker rooms and changing rooms. 4-ER-805; 2-ER-331–35 156:5–160:13; 6-ER-1436–37 ¶¶37–38; 6-ER-1443 ¶¶72–73. Brown explained that she was motivated by sincere religious concern to help others, *see supra* Part I.B, and she was concerned with predatory biological males, regardless of gender identity. 4-ER-840; *see also* 4-ER-949; 4-ER-715–16 216:6–217:11; 4-ER-737–38 312:5–313:8; 6-ER-1464–65 ¶¶9–11 (expert report of Dr. Callie Burt); 6-ER-1471–76 ¶¶30–45 (same). Still,

34

several supervisors testified that there was no way for Brown to raise her concerns about the Equality Act's impact on women's safety without violating company policy. 3-ER-601 148:2–20; 4-ER-720 246:11–21; 4-ER-780–81 34:9–35:5. The Airline fired Brown, even though flight attendants have "a protected right to express concerns about [their] working conditions." 7-ER-1681–83 (no investigation of flight attendant A.N. for raising safety concerns related to religious employees).

It is anti-religious stereotyping to disparage sincere Christians like Brown as "hateful" toward people who have different beliefs, despite knowing that Brown was happy that the Airline supported LGBT rights and worked well with everyone. 6-ER-1431–33 ¶¶5, 8, 11–16; 6-ER-1437 ¶41; 6-ER-1440 ¶54; 4-ER-912; *see Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003).

The lower court erroneously held that disparaging Plaintiffs' beliefs as discriminatory was not "direct evidence" of discrimination because an additional inference would be required. 1-ER-19–20. It then proceeded to ignore this evidence.

### 6. Leadership bypassed normal procedures to fire Plaintiffs.

Airline leadership were offended by Plaintiffs' religious beliefs. 4-ER-743 26:16–20; 4-ER-786 41:8–14; 4-ER-758 194:2–3; 4-ER-751 105:10–17; 7-ER-1563 ("These are offensive viewpoints"); *see also* 4-ER-829; 4-ER-898. Brown's initial Union representative told her that the Airline would either give her a slap on the wrist or use her case to send a message. 6-ER-1438 ¶45. Alaska Airlines leadership

were unusually, personally involved to ensure that the two Christians who posted about the Equality Act were censored, investigated, terminated, and their grievances denied, refusing even to grant a LCA to be reinstated. *See* 4-ER-794; 3-ER-602 164:10–23; 4-ER-757–58 193:18–194:23; 4-ER-769–70 7:24–8:11 (not typical for Vice President of Inflight to be decisionmaker); 4-ER-792–93 68:25–69:6 (Schneider supported firing Plaintiffs); 4-ER-966–72.

Brown's Inflight Supervisor Lewis, who had over 20 years of experience with the Airline, recommended that Brown receive <u>no</u> discipline – only a record of discussion. 4-ER-714 212:9–22; 4-ER-724 260:2–3. But the Airline was determined to terminate. 4-ER-717 229:1–22.

The Airline bypassed its normal rules, skipping all levels of progressive discipline for Brown, and proceeded straight to termination. *See* 4-ER-887. Brown had no prior discipline. 2-ER-359–60 (RFA 13–14). Proceeding from no discipline straight to termination is exceedingly rare and would only be done in the most serious of cases, such as testing positive for cocaine at work. 3-ER-667–73 42:6–43:7, 48:7–51:15, 54:3–5; 4-ER-747–48 44:19–45:23; 4-ER-761–62 251:9–252:19.

The Airline immediately removed Plaintiffs from their scheduled routes, treating them as safety risks, which drew attention from other employees. Prohibiting a flight attendant from flying is only done when necessary due to the "[r]isk posed by the accused's continued presence in the workplace." 4-ER-817; 4-

36

ER-694 132:1–12; 4-ER-751–52 105:23–106:10 (only done for "particularly egregious" behavior). Yet it knew Plaintiffs were not safety risks. *See* 9-ER-2327–30 142:13–145:9. The Airline further discriminated against Smith by removing her Known Crewmember airport security clearance, without any basis, when she received her NOD. 3-ER-603–04 167:3–168:15; 7-ER-1673; 7-ER-1678.

Their public terminations sent a message to other Christians. In her witness statement, another flight attendant wrote that the Airline fired Plaintiffs to "make other Christians afraid to make comments or even ask questions." 3-ER-504–05 ¶16. The court did not explain why a jury could not view all this evidence together to infer religious discrimination. *See Raad*, 323 F.3d at 1194 ("All of the evidence—whether direct or indirect—is to be considered cumulatively.").

**7. The Airline treated the Plaintiffs worse than other employees who were disciplined for reasons other than their religious beliefs.**

The Airline treated Plaintiffs worse than other employees who posted on Alaska's World:

- Employees, including flight attendant G.N., posted Alaska's World comments perceived as offensive, racist, or hurtful and received no discipline. *See supra* Part I.D.4.

- Employees posted non-religious criticisms of the Equality Act on Alaska's World and received no discipline. 4-ER-928–29 ("M.S."); 2-ER-372 (RFA 4).

37

- Flight attendants posted moral beliefs in favor of the Equality Act and received no discipline. 4-ER-923 ("A.T."); 4-ER-926 ("S.K.)"; 2-ER-372 (RFA 4).

- Flight attendant L.B. was given many opportunities to change her behavior regarding her Alaska's World and social media posts. 2-ER-180–88; *see also* 7-ER-1705.

The Airline disciplined several employees less severely for discrimination, harassment, or offensive speech online.

- The Airline issued no discipline to flight attendants H.B. and A.N. for anti-Christian or anti-religious harassment. ("H.B.") 3-ER-595–96 116:19–117:22; 3-ER-605–09 179:15–183:20; 5-ER-1092–103; 10-ER-2493–95; ("A.N.") 7-ER-1681–82; 10-ER-2427–28 87:2–88:14.

- The Airline issued only a warning to flight attendant ("J.R.") for a threat of violence against Christians on social media. 4-ER-952–58; 5-ER-1143.

- The Airline issued only written warnings to employees for social media posts comparing the Airline to "Auschwitz," ("R.R.") 7-ER-1719–20, and saying "I want to punch Canadians in the face," ("E.G.") 7-ER-1714.

- The Airline only issued short (1–5 day) suspensions to flight attendants for remarking to a Black passenger seated that he was sitting "in the back of the bus," ("C.S.") 7-ER-1723–24; for using an "inflammatory and racially

derogatory term" on social media, ("V.F.") 7-ER-1711–12, ("A.S.") 7-ER-1721–23; and for calling passengers "Idiots" on Facebook, ("C.Sc.") 7-ER-1726–28.

Moreover, Alaska Airlines refused Plaintiffs a LCA to be reinstated, while reinstating others who committed serious infractions. 4-ER-773–75 27:16–29:12.

- A flight attendant ("D.T."), fired for telling another flight attendant to show "a little tittie," got his job back. 5-ER-1104–06; 5-ER-1174; 5-ER-1047 (internal investigation listing D.T. as comparator for Brown).

- A male employee ("I.H."), fired for inappropriately touching a woman, got his job back. 4-ER-678–79 79:14–80:6; 5-ER-1108–11; 5-ER-1107.

- A flight attendant ("C.H."), fired for race discrimination who called the plane "a slave ship" in front of passengers, got her job back. 6-ER-1328–29; 4-ER-763–65 258:10–260:15.

The Airline treated Plaintiffs worse than employees who were disciplined for reasons other than their religious beliefs. The lower court erred by not viewing the cumulative evidence and instead rejecting each comparator as if it were presented in isolation because it was not identical to Plaintiffs. *See Coleman v. Donahoe*, 667 F.3d 835, 846–50 (7th Cir. 2012); *Earl*, 658 F.3d at 1114.

### E. There is sufficient evidence that the Airline fired Lacey Smith because of her religious beliefs.

The evidence above also supports a finding that the Airline discriminated against Smith because of her religious beliefs. If Smith had different religious beliefs, she would not have been fired.

### 1. Even though the Airline knew Smith's comment violated no policies, it fired her because of her moral beliefs – beliefs she held because she was a Christian.

Smith is a Christian. 6-ER-1373–74 ¶¶1–8. Her beliefs about morality come from her Christian faith. 6-ER-1373 ¶3; 9-ER-2106 604:10-17; 8-ER-1993 196:6; 8-ER-1951–53 109:6–111:21. At work, Smith had a reputation as a Christian and wore a cross necklace. 3-ER-494–96 ¶¶3, 18; 3-ER-499 ¶10; 6-ER-1394 ¶8; 3-ER-537–38 191:16–192:8. She was known to the Airline for her petition cautioning the Airline not to support the BLM organization because of its radical ideology. 6-ER-1411–13. The Airline suspended Smith because of her petition. 6-ER-1419–21. Smith opposed the BLM organization, at least in part, because of its anti-Christian ideology. 3-ER-434–38 119:5–123:2; 8-ER-1959–70 126:8–128:13, 135:3–136:17, 157:4–159:13. Many employees similarly complained to the Airline that the BLM organization was an anti-religious and anti-Christian organization. *See, e.g.*, 5-ER-1247–49; 5-ER-1255; 5-ER-1265; 5-ER-1270; 6-ER-1278; 6-ER-1284; 2-ER-160–62; *see also* 6-ER-1487–88 (expert report).

Later, the Airline fired Smith because of her comment on its Equality Act

40

article, "As a company, do you think it is permissible to regulate morality?" 6-ER-1384 ¶60; 4-ER-898–900.

The Airline initially did not view this comment as a violation of any of its policies. The Airline discussed internally how to respond to Smith's comment. 5-ER-1055–59. It was the Airline's practice to remove comments deemed discriminatory. 3-ER-654 123:4–7; 4-ER-742–43 25:4–26:2. The Airline chose not to remove her comment, but, instead, to engage in dialogue. 5-ER-1055–59; 3-ER-652–53 120:20–121:5; 3-ER-646–48 113:23–115:10; 2-ER-144–45 ¶109. There are no other instances in which the Airline responded to an Alaska's World comment and then fired the commentor for the comment. 3-ER-450 (RFA 14). It was not until after Brown commented, and the Union President complained to the Airline that too many people struggle to unify their faith with inclusivity, that the Airline removed Smith's comment. 5-ER-1060–61; 7-ER-1781.

The Airline fired Smith because it found her beliefs about morality – beliefs she held as a Christian – to be offensive. During the Airline's internal discussions about how to respond to Smith's comment, the Managing Director of Communications asked, "do you want to use this as an opp[ortunity] to educate on the concept of everyone having a right to have their own beliefs? What this person feels is moral is not necessarily the same definition that others have." 5-ER-1057. In response, Taylor Ball from the Legal Department wrote, "We should stay away from

'everyone has a right to have their own beliefs' in this case because the 'belief' is actually discrimination. Employees actually do not have the right to believe that LGBTQ rights are 'immoral.'" 5-ER-1055. Williams, the ultimate decisionmaker, wrote, "I 100% agree." *Id.* Instead of acknowledging employees have a right to their own beliefs, the official response to Smith's comment on Alaska's World emphasized that the Airline's values require it to support the Act and it "expect[s] our employees to live by these same values." 4-ER-917.

The NOD confirmed that the Airline fired Smith because of its perception of her moral beliefs about gender identity or sexual orientation. 4-ER-898–900; *see also* 3-ER-588–89 79:21–80:15; 4-ER-786–90 41:1–42:1, 43:2–44:14, 55:9–20. It stated, "Defining gender identity or sexual orientation as a moral issue ... is not a philosophical question, but a discriminatory statement." 4-ER-898. Noelle Berner, Smith's supervisor, affirmed that it violated company policy for employees to express moral beliefs opposed to LGBTQ activity. 3-ER-599–601 146:3–148:20. When asked where they would be allowed to mention such beliefs, she responded, "At home without any other employees being, you know, there to hear it. That would be okay." 3-ER-599 146:8–16; 3-ER-610 192:5–15.

### 2. Alaska Airlines knew, or at least suspected, that Smith's moral beliefs were religious.

The lower court concluded that an additional inference was needed to show that "Alaska made the connection between Smith's statement and her religion"

42

because not all Christians, as the court pejoratively phrased it, "question[] the morality of equal rights for LGBTQ individuals." 1-ER-17.[10] The court then stated that it was not disputed that Alaska had actual or constructive knowledge that Smith was a Christian. 1-ER-17 n.13. This is disputed. The evidence shows that Alaska knew, or at least suspected, that Smith's beliefs were religious.

First, the Airline knew that many people (such as Brown) had religious concerns with the Equality Act, and thus had reason to suspect that Smith's moral beliefs about the Act were religious, particularly in light of Smith's reputation at work as a Christian. *See supra* Part I.E.1. The Airline repeatedly stated that it understood the Act "touches on religious freedom concerns." 5-ER-1031; 6-ER-1303–07; 6-ER-1311–17. Sprague wrote that he heard about Brown and Smith's comments, affirming that a "very large percentage of our employees and guests" share their real religious freedom concerns about the Act. 5-ER-1002. The Airline knew that "religious concerns" were "continuing to come up" about the Act. 3-ER-638–40 80:12–82:21; 5-ER-1001–08.

Moreover, it is common knowledge that many Christians have religious beliefs about sexual morality. *See Boudreaux*, 86 F.4th at 635; *Obergefell*, 576 U.S.

---

[10] The record shows Plaintiffs supported nondiscrimination and equality for LGBTQ individuals but opposed the Equality Act as a means of achieving that goal. 5-ER-1052–63; 6-ER-1457; 6-ER-1431 ¶5; 6-ER-1440 ¶54; 6-ER-1374 ¶7; 6-ER-1386 ¶72; 7-ER-1693; 8-ER-1857 304:5–12; 8-ER-1859–60 306:21–307:1; 8-ER-1986–87 186:18–187:6.

43

at 672; 6-ER-1483–86 ¶¶2–5, 9 (expert report of Dr. Mauser). The Airline knew many people, including employees, held beliefs about sexual morality for religious reasons. *See* 5-ER-1001–08. Yet the Airline was so intolerant that it fired Smith for asking a question suggesting that she held such beliefs.

Second, Alaska Airlines had actual knowledge of Smith's *moral beliefs* or, at a minimum, fired her because of its perception of Smith's moral beliefs. 4-ER-898; 8-ER-1992–94 195:4–197:11. Employees' moral beliefs on issues of sexuality are protected against religious discrimination. The EEOC defines "religious practices" to "include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. § 1605.1. Alaska Airlines itself defined religious harassment as harassment based upon employees' "belief systems" or "lack of [belief system]." 5-ER-1113. Smith's supervisor testified that moral statements can be both philosophical and religious, 3-ER-597 134:8–10, and the Union President testified that "religious beliefs are mostly … also involved with morality," 9-ER-2270 241:2–19. Actual knowledge that Smith's moral beliefs were specifically Christian is not required.

Either way, it violates Title VII for employers to make a blanket policy prohibiting employees from revealing moral beliefs that they know are held by many for religious reasons. An employer discriminates by making rules that turn on a protected characteristic, even if the employer never learns the employee's protected

44

characteristic. *Bostock*, 590 U.S. at 668–69. For instance, take an employer who knows many Muslim women wear head-coverings and nevertheless rejects all applicants who wear head-coverings. A rejected Muslim applicant has a viable claim for religious discrimination. *Abercrombie*, 575 U.S. at 770, 774. It is no defense that the employer would also have fired people who wear head-coverings for non-religious reasons or because they practice a different religion. *Id.* at 775. The lower court incorrectly wrote that in *Abercrombie*, the applicant made an "*accommodation request.*" 1-ER-17 n.1 (emphasis in original). But she did not. The employer simply assumed from the headscarf that she might be Muslim and refused to hire her. *Abercrombie*, 575 U.S. at 770. The Supreme Court rejected Abercrombie's argument that it cannot be held liable because it did not *know* that the applicant wore headscarves for religious reasons. *Id.* at 773–75. Similarly, an employer is not protected from liability by pretending that it does not know many people who hold traditional moral beliefs about gender and sexuality do so for religious reasons.

Moreover, the Airline undisputedly had actual knowledge that Smith's moral beliefs were religious before her termination was final. Under the CBA, a termination is not final until the grievance is denied. 4-ER-882, §§ C.1 & C.7. During the grievance hearing, Smith gave a statement complaining of illegal religious discrimination and asking for a religious accommodation. 7-ER-1577–88. At a minimum, at that point, Alaska Airlines was on notice that a religious

accommodation may be required. *See Abercrombie*, 575 U.S. at 775 (when accommodation needed as an aspect of religious practice, it is "no response" that adverse action was "due to an otherwise-neutral policy"). Yet, Alaska Airlines failed to engage in any interactive dialogue, failed to consider whether she could be accommodated without undue hardship, and failed to provide a response. *Groff v. DeJoy*, 600 U.S. 447, 473 (2023) (requiring consideration of other options). Simply removing Plaintiff's comments and allowing her to remain employed would not have caused an undue hardship. *See id.* at 472–73. The Airline's treatment of Plaintiffs' religious accommodation requests violates Title VII's disparate treatment provision. *See Abercrombie*, 575 U.S. at 771–72 (holding failure to accommodate part of disparate treatment).

The court wrote that what Alaska learned later in the disciplinary process is not relevant. 1-ER-17 n.1. But consider the *Abercrombie* example, with a modification. Assume Abercrombie told the applicant that it rejected her application because of her headscarf. If at that point, after the termination decision was made, the applicant explained that she wore it for religious reasons, then the employer undeniably would have a legal duty to revisit the decision and consider a religious accommodation.

### F. The Airline may not simply point to its harassment policy to avoid liability for discrimination.

An employer cannot avoid liability simply by classifying its discriminatory

46

behavior as something else. It is "irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it." *Bostock*, 590 U.S. at 645. Alaska Airlines claims it is entitled to fire Plaintiffs under its harassment policy because coworkers perceived Plaintiffs' comments as offensive. It is, of course, lawful for employers to have policies against harassment. Employers cross the line when those policies, whether on their face or as applied, are discriminatory.

If an employer applies its harassment policy in a discriminatory way, the employer violates Title VII. *See Vasquez v. City of Idaho Falls*, 778 F. App'x 415, 417 (9th Cir. 2019); *Earl*, 658 F.3d at 1117; *Coleman*, 667 F.3d at 851–52. At a minimum, the evidence raises a genuine issue of material fact about whether the Airline applied its policies in a discriminatory way against Plaintiffs, treating them more harshly because of their religious beliefs. For example, letting anti-Christian harassment slide while giving the most severe punishment to Christians who allegedly violate the harassment policy shows discrimination against Christians.

More fundamentally, the evidence shows that the Airline's harassment policy is *itself* discriminatory. The Airline's policy forbids expressing certain beliefs that coworkers find offensive. Its policy is so broad that it encompasses even using the phrase "opposite sex" because that implies that there are only two sexes. It is discriminatory to fire Plaintiffs for simply expressing their religious beliefs because

47

other employees may find those beliefs offensive. *See Groff*, 600 U.S. at 472 (coworker "bias or hostility to a religious practice" is not a defense that would justify denying religious accommodation). Title VII requires tolerating the religious beliefs of employees, even beliefs that the employer dislikes.

Merely being exposed to the religious beliefs of a colleague is not harassment. As the Airline recognized, "[s]imply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII." 6-ER-1368 (Alaska Airlines' brief quoting *McGinest*, 360 F.3d at 1113); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment"). Plaintiffs' isolated comments reflecting their religious beliefs come nowhere close to this standard and are not harassment.

A phantom concern by an employer about avoiding liability based upon hostile work environment claims does not justify engaging in actual discrimination based upon religion. *See Ricci v. DeStefano*, 557 U.S. 557, 584–85 (2009) (holding desire to avoid disparate impact liability does not excuse actual disparate treatment of other employees); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022) ("concerns about phantom constitutional violations" cannot "justify actual violations of an individual's First Amendment rights" in the Free Exercise context); *Santillan v. USA Waste of California, Inc.*, 853 F.3d 1035, 1045 (9th Cir. 2017) ("But that is

48

not what the law required, and an employer's incorrect view of the law is not a legitimate reason for firing an employee."). To illustrate: assume an employer considers it harassment for an employee to suggest that he holds moral beliefs in favor of same-sex marriage. The employer calls this harassment because other employees were offended by his beliefs. This is not harassment and would not be a legitimate defense to a charge of discrimination.

The Airline's asserted rationale for firing Plaintiffs is *itself* discrimination because it labels Plaintiffs' sincere religious beliefs as hateful, offensive, discriminatory, and a terminable offense. The lower court erred by crediting the employers' asserted rationale as "reasonable," 1-ER-29, while discounting all evidence of religious discrimination, to grant summary judgment to the Airline. *See Costa*, 299 F.3d at 850–51; *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (holding if protected characteristic is a but-for cause, "a plaintiff is not *required* to demonstrate the falsity of the employer's proffered reason."). Plaintiffs have presented ample evidence that religion was a but-for cause of the terminations and that Alaska's policies were applied in a discriminatory way – either of which is sufficient to grant summary judgment to Plaintiffs or at least proceed to a jury trial.

## II.    Plaintiffs presented sufficient evidence that the Union discriminated against Plaintiffs because of their religious beliefs.

Under Title VII, labor organizations may not "discriminate against" an individual, "adversely affect his status as an employee," or "cause or attempt to cause

49

an employer to discriminate against an individual" "because of" religion. 42 U.S.C. § 2000e-2(c); *Groff*, 600 U.S. at 459 n.5. Unions may not "knowingly acquiesce in employment discrimination against their members, join or tolerate employers' discriminatory practices, or discriminatorily refuse to represent employees' interests." EEOC COMPLIANCE MANUAL, §12-I.B (collecting cases).

The Union violated Title VII many times over. The Union President reported Plaintiffs' comments to the Airline for discipline. The Union advocated against them in communications with the Airline, statements to other employees, and its newsletter. It advised Brown against raising her religious rights, failed to make arguments on behalf of Plaintiffs' religious rights, failed to grieve religious discrimination, failed to take Plaintiffs' cases to arbitration, and failed to give Plaintiffs the diligent representation that it gives other protected classes. All the while, Union officials repeatedly disparaged Plaintiffs and their religious beliefs.

## A. The Union president reported Plaintiffs' comments for discipline, colluding with the Airline and advocating against Plaintiffs.

Union President Peterson learned of Smith's comment from an Alaska Airlines pilot, who texted, "Please be bias[ed] if Lacey Smith ever needs union help lol," followed by a picture of the comment. 5-ER-1134–35. Peterson then reached out to Schneider, reporting Smith's comment and asking about discipline. 5-ER-1135; 4-ER-935; 3-ER-526–27 140:12–141:11. This was, of course, not Peterson's normal practice. 3-ER-527–28 141:7–142:5. Schneider and Peterson coordinated

50

about how to respond to Smith. 5-ER-1136–37; 4-ER-935; 9-ER-2218–21 157:8–160:4. Peterson called Smith's post an "obvious microaggression." 4-ER-935; 9-ER-2222–24 161:6–163:3. While texting with Schneider, Peterson texted Goldhamer that he hates Smith, adding, "I just got off the phone with Andy [Schneider] about this." 5-ER-1134–35. That morning, Peterson also called Williams to report Smith's comment. 5-ER-1146. Soon other Union officials started a conversation about Smith's comment. 5-ER-1145–47. At 12:20 p.m., Peterson informed them, "I have talked with [Williams] and [Schneider].… [W]e'll let you know if there are additional opportunities to provide feedback to management." 5-ER-1146.

Later that night, Taylor saw Brown's comment and posted it in a Google Chat with other Union representatives, adding, "Can we PLEASE get someone to shut down comments, or put Marli and Lacey in a burlap bag and drop them in a well." 5-ER-1116; *see* 5-ER-1117 (adding "She needs to go!"); 2-ER-262 ¶45. Peterson then reported Brown's comment to Airline leadership. 5-ER-1060–62; 3-ER-530–31 167:1–168:21; *see also* 5-ER-1116–17. Peterson knew that Brown's comment was religious. 3-ER-533 170:9–12. While reporting Brown, Peterson complained to the Airline about her religion, "I wish fewer people would struggle so much with unifying their faith with inclusivity." 5-ER-1060–61; 9-ER-2232–33 171:10–172:4; 2-ER-248 ¶100.

Under Title VII, "[a] union has an affirmative obligation to oppose

employment discrimination against its members. If instead it acquiesced or joined in the Airline's discriminatory practices, it too is liable to the injured employees." *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1304 (9th Cir. 1982); *see also Woods v. Graphic Commic'ns*, 925 F.2d 1195, 1201 (1991) ("A union may also be liable under Title VII for acquiescing in a [] discriminatory work environment."); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 666–67 (1987). Here, the Union far more than acquiesced in Plaintiffs' discipline. It "attempted to cause" discipline. 42 U.S.C. § 2000e-2(c)(3); *Carter v. Transp. Workers Union of Am., Loc. 556*, 602 F. Supp. 3d 956, 965 (N.D. Tex. 2022) (denying summary judgment where union president reported flight attendant to airline over online posts). Union president Peterson made several calls, emails, and texts to the Airline to report Plaintiffs' comments, seeking repercussions. *See* 4-ER-935; 5-ER-1060–62; 5-ER-1136–39; 3-ER-526–29 140:12–143:8; 5-ER-1145 (Peterson to Union officials: "there should be repercussions"); 9-ER-2210–11 149:18–150:4.

The Union further advocated against Plaintiffs by publishing a newsletter against religious expression at work, while it was supposed to be advocating for Plaintiffs. The article, entitled "How the First Amendment Applies in the Workplace," was a thinly-veiled attack against Christians like Plaintiffs. 4-ER-893–94. The Union MEC Grievance Chairperson Stephanie Adams wrote the article. 4-ER-891. She asked about the impropriety of publishing it on the same day Brown

and Smith received their Notices of Discharge, but the Union chose to publish. 5-ER-1152. The article implied that Plaintiffs' sincere invocation of their religious rights was instead seeking to "us[e] [their] protected status" to discriminate. *See* 4-ER-894. Union officials and Airline representatives greeted the article with cheers of approval and further disparaging remarks directed at Plaintiffs. 4-ER-891–93 (Peterson praising article for "educating a certain faction of our membership that bigotry in the workplace is definitely *not* protected behind a (false) shield of 1st Amendment rights"); 6-ER-1300. Mike Link, the Alaska Airlines official who would decide Plaintiffs' grievances, noted the article and sent it to the Legal Department. 7-ER-1778. Peterson also coordinated with Airline management about revising the Alaska's World Commenting Rules, signaling approval of Plaintiffs' discipline for their comments. 9-ER-2146–47 62:20–63:2; 9-ER-2168–70 87:15–89:21. The Union's actions and inactions left the Airline with the understanding that it agreed "off the record" with the discipline. 5-ER-982. There is at least a genuine issue of material fact that the Union advocated against Plaintiffs in advance of Plaintiffs' grievance hearings, signaling agreement with the Airline's discipline, and undermining Plaintiffs' chance of successfully grieving their terminations.

The lower court erred by "reject[ing] the characterization of Peterson's texts to Alaska's personnel as 'reporting' Plaintiffs' conduct" because Alaska would have found out about the comments even if Peterson had not have reported them. 1-ER-

53

56. But Title VII prohibits *attempting* to get Plaintiffs disciplined. The Union does not have to be successful or the sole cause of a termination in order to be liable.

The court also erred by holding that there was not anything "substantive" about the interaction that raised a reasonable inference of religious discrimination. 1-ER-57. But Peterson complained to the Airline about Plaintiffs' religious "faith" *while* he was reporting them to the Airline. 5-ER-1061. A reasonable jury could certainly conclude that violating standard practice to report employees for discipline, seeking repercussions, while complaining that you do not like the employees' religious faith is religious discrimination. *See Carter*, 602 F. Supp. 3d at 965.

## B. Union officials repeatedly expressed animosity to Plaintiffs' religious beliefs.

Peterson repeatedly referred to Brown and Smith as "bigots," told a friend "I hate [Smith]," and told others he supported her discipline. 5-ER-1145–46; 5-ER-1150; 4-ER-891; 5-ER-1134–35; 4-ER-910; 6-ER-1295–301; *see also* 5-ER-982. Brown's Union representative Taylor suggested that Brown and Smith should be put in a burlap bag and dropped in a well, texted Adams "I may hurl" during Brown's investigatory meeting when Brown was explaining her religious beliefs and expressed to others within the Union her support for Brown's termination. 5-ER-1116–17; 4-ER-849; 4-ER-938 (Taylor hoping Brown will be disciplined); *see also* 6-ER-1343 (Taylor: "This is reprehensible"); 4-ER-856; 6-ER-1295–301. Adams was "disgusted" by Smith's comment, referred to Brown and Smith's comments as

54

"shitty" and "BS," agreed with a friend who said they worked with some 3 and wrote the article minimizing employee religious rights. 6-ER-1345; 4-ER-931–33; 4-ER-891; 6-ER-1295–301.

The court wrongly dismissed evidence of the Union's bias against Plaintiffs' religious beliefs. 1-ER-59. Disparaging statements such as these are direct evidence of religious discrimination, or at least raise an inference of religious discrimination. *Dominguez-Curry*, 424 F.3d at 1038; *see also Meriwether*, 992 F.3d at 513–14. The Union disparaged Plaintiffs despite knowing that Brown and Smith held unblemished track records of working well with LGBTQ coworkers and counted LGBTQ individuals among their family and friends. 2-ER-339–41 308:22–310:3; 3-ER-439–43 293:16–294:16, 315:16–316:19, 325:1–5; 3-ER-588 79:21–25; 4-ER-711 196:11–16; 4-ER-756 138:1–11. The evidence is sufficient to create at least a genuine issue of material fact that Union's aversion to Plaintiffs' religious beliefs caused them to discriminate against Plaintiffs.

### C. The Union failed to grieve the religious discrimination that Plaintiffs suffered and failed to advocate for them on the basis of religion.

A union violates Title VII if it intentionally fails to file grievances concerning alleged Title VII violations. *See Goodman*, 482 U.S. at 664–65 ("[T]he Unions' failure and refusal to assert racial discrimination as a ground for grievances; and toleration and tacit encouragement of racial harassment" violated Title VII); *Woods*, 925 F.2d at 1200; *Beck v. United Food & Com. Workers Union, Loc. 99*, 506 F.3d

874, 882 (9th Cir. 2007). Although the Union filed grievances, it failed to defend Plaintiffs on religious discrimination grounds. Brown raised her concerns about religious discrimination with Taylor. 6-ER-1438–39 ¶¶46, 49; 2-ER-350–52 101:8– 103:12; 4-ER-754–55 116:24–117:2; 6-ER-1489–92; *see also* 6-ER-1441 ¶62. Yet Taylor never argued religious discrimination to the Airline. 3-ER-401–02 (RFA 6– 7); 2-ER-146 ¶155. Not only that, but the Union actively dissuaded Brown from raising religion. 6-ER-1445–46 ¶¶80–86; 8-ER-1865–66 312:1–313:14; 8-ER- 1914–19 267:16–272:18; 3-ER-510–12 27:18–29:5. Before the grievance hearing, the Union instructed her to withhold a written statement about religious discrimination and religious accommodation that she wanted to submit. *Id.*; *see* 4- ER-838–41. And the Union entirely failed to consider religious discrimination arguments based upon the Airline's regulation of Smith's moral beliefs, even though the Union knew moral beliefs are part of some flight attendants' religions. *See* 3- ER-475–76 (RFA 6–10); 3-ER-540 241:2–19. The Union was purposefully blind or hostile to Plaintiffs' concerns about religious discrimination.

### D. The Union failed to provide the same quality of representation for Brown and Smith as it did for other employees.

The Union's approach to other disciplinary cases not involving religion further shows that it intentionally discriminated against Plaintiffs. *Beck*, 506 F.3d at 883–84. The Union took to arbitration cases of individuals accused of sexual and racial harassment. 5-ER-1157–64 (C.C.); 5-ER-1185–88 (R.N.); 3-ER-542–44

25:5–20 (C.C.), 33:5–21 (R.N.). It took the racial harassment case of C.C., a flight attendant who threatened to "lynch" a Black supervisor in an elevator, while miming strangling her. 5-ER-1157–64; 7-ER-1735–39; 5-ER-1165–73. It took R.N.'s sexual harassment case, where a flight attendant was fired after being accused of grabbing a coworker's breasts, reaching up a coworker's skirt, and forcibly hugging a coworker without consent. 5-ER-1185–88; 7-ER-1822; 5-ER-1189–221. The Union argued that R.N. "deserves another chance" but declined to arbitrate Plaintiffs' cases. 5-ER-1213. The Union zealously advocated for others, such as for uniform policy changes on behalf of non-binary and gender nonconforming flight attendants. *See, e.g.*, 3-ER-513–17 41:21–45:21; 4-ER-879–80; 5-ER-1082–90; 5-ER-1123–29; 3-ER-521–25 99:9–103:10. By contrast, the Union advised religious employees to stay quiet. 4-ER-893–94; 4-ER-939; 5-ER-1132; 6-ER-1433 ¶19.

The court wrongly distinguished these comparators, stating the alleged harassing conduct was only directed at one or two employees. 1-ER-60. But unwanted sexual contact and specifically targeted harassment are far more serious forms of harassment. *See Manatt*, 339 F.3d at 798. The cumulative evidence is more than sufficient for a reasonable jury to find unlawful discrimination.

## III. Plaintiffs' state law discrimination claims against the Union are not preempted by the Railway Labor Act.

The lower court erroneously dismissed the Plaintiffs' state law claims against the Union, finding them preempted by the Railway Labor Act ("RLA"). 1-ER-66–

75; 2-ER-125–27 ¶¶ 433–51; 2-ER-129–31 ¶¶472–85.

The Ninth Circuit "recognize[s] RLA … preemption only where a state law claim arises entirely from or requires construction of a CBA." *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 913–14 (9th Cir. 2018). It is not preempted if it involves rights "that exist independent of the CBA." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994). Because "[t]here is no doubt that Title VII rights … 'exist independent'" of the CBA, *Felt v. Atchison, Topeka & Santa Fe Ry. Co*., 60 F.3d 1416, 1419–20 (9th Cir. 1995) (citing *Norris*, 512 U.S. at 258), parallel state law rights also exist independent of the CBA. Plaintiffs' state-law claims "can be resolved without interpreting the agreement itself" and thus are "independent of" the CBA and should survive the motion to dismiss.[11] *Wolfe v. BNSF Ry. Co*., 749 F.3d 859, 864 (9th Cir. 2014) (internal quotation marks omitted).

To hold otherwise is inconsistent with the history of the RLA and Title VII. The Railway Labor Act was enacted in 1926, Act, May 20, 1926, c. 347, 44 Stat. 577 (codified at 45 U.S.C. § 151 *et seq*.), and amended to include airlines in 1936, Act of Apr. 10, 1936, c. 166, 49 Stat. 1189 (codified at 45 U.S.C. § 181). Subsequently, in the 1940s, the Supreme Court developed "the statutory duty of fair representation." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). There is no evidence that

---

[11] Although it has not directly addressed this question, in *Woods*, 925 F.2d 1195, the Ninth Circuit recognized claims of employment discrimination brought against a union under the WLAD without addressing the question of preemption.

duty of fair representation "was designed or intended to preempt state laws focused on combatting invidious discrimination," *cf. Figueroa v. Foster*, 864 F.3d 222, 233 (2d Cir. 2017), or that "that [state law] discrimination … claims conflict with [the duty of fair representation] or otherwise frustrate the federal scheme," *Markham v. Wertin*, 861 F.3d 748, 759 (8th Cir. 2017). Quite the opposite. When Congress passed Title VII in 1964, it explicitly prohibited unions from discriminating against members on the basis of their protected status, 42 U.S.C. § 2000e-2(c), specified that state antidiscrimination laws remain in effect, 42 U.S.C. § 2000e-7, and directed that the EEOC work with state agencies combatting discrimination, *see, e.g.*, 42 U.S.C. § 2000e-5.[12] Clearly, Congress did not view the duty of fair representation as encompassing all union obligations to avoid illegal discrimination. *See Figueroa*, 864 F.3d at 233 ("the text of Title VII also recognizes the existence and continued viability of state mechanisms" creating union liability for discrimination).

Moreover, the rights of employees not to be discriminated against on various grounds is not one that could be bargained away and therefore is not an appropriate arena for state-law preemption. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985). To hold that the RLA preempts state law discrimination claims would

---

[12] The lower court's suggestion, drawn from *Adkins*, that the mere existence of the union-member relationship would preempt Title VII claims explicitly contradicts the language of Title VII and goes beyond court precedent. *See Adkins v. Mireles*, 526 F.3d 531, 539-40 (9th Cir. 2008).

also erase state law protections for a more expansive universe of protected classes than those included in Title VII. For example, Washington prohibits discrimination on the basis of "marital status, … citizenship or immigration status, honorably discharged veteran or military status." Wash. Rev. Code § 49.60.190. Oregon prohibits discrimination "because of an individual's … marital status or age if the individual is 18 years of age or older, or because of an individual's juvenile record that has been expunged." Or. Rev. Stat. § 659A.030(1)(c). These state law rights would be obliterated as to unions under the lower court's ruling. Thus, "[p]re-emption of employment standards within the traditional police power of the State should not be lightly inferred." *Norris*, 512 U.S. at 252 (internal quotation marks and citations omitted). The lower court erred in categorically ruling that the state employment discrimination law claims against the Union are preempted by the RLA.

CONCLUSION

The Court should reverse the lower court's entry of summary judgment in favor of Defendants and grant summary judgment in Plaintiffs' favor or remand the case for trial.

October 14, 2024                           Respectfully submitted,

                                           */s/ Stephanie N. Taub*

**Andrew W. Gould**                        **Jeffrey C. Mateer**
HOLTZMAN VOGEL BARAN                       **David J. Hacker**
TORCHINSKY & JOSEFIAK,                     **Stephanie N. Taub**
PLLC                                       FIRST LIBERTY INSTITUTE
2575 East Camelback Road, Ste.             2001 West Plano Pkwy., Ste. 1600
860                                        Plano, TX 75075
Phoenix, AZ 85016                          (972) 941-4444
(540) 341-8808                             jmateer@firstliberty.org
agould@holtzmanvogel.com                   dhacker@firstliberty.org
                                           staub@firstliberty.org

                                           **Rebecca R. Dummermuth**
                                           **Tabitha M. Harrington**
                                           FIRST LIBERTY INSTITUTE
                                           1331 Pennsylvania Ave. N.W., Ste.
                                           1410
                                           Washington, DC 20004
                                           (202) 921-4105
                                           bdummermuth@firstliberty.org
                                           tharrington@firstliberty.org

                                           *Attorneys for Plaintiffs-Appellants*

61

CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** 22-15485

I am the attorney or self-represented party.

**This brief contains 14,000 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature: */s/ Stephanie N. Taub*     Date: 10/14/2024

## CERTIFICATE OF SERVICE

On this 14th day of October 2024, a true and correct copy of the foregoing was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Ninth Circuit, which currently provides electronic service on the counsel of record.

*/s/ Stephanie N. Taub*
Stephanie N. Taub